**LAURENA PARKER,**

   **Plaintiff,**

**vs.**           **Case No. 8:18-CV-01197-EAK-CPT**

**SOUTHWEST AIRLINES CO.,**

   **Defendants**

_____/

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Laurena Parker, ("Plaintiff"), through its undersigned counsel, and files this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Memo") (Docket No. 46), and in support thereof, states and alleges as follows:

## I: INTRODUCTION

An innocent, retired and elderly African American female, aboard Flight 551, was falsely accused of having an odor, called a bitch, implicated as a liar, requested by a white racist couple to be moved from her seat directly next to them, actually removed from her seat, ejected from the airplane, forced to sit in another seat near the white racist couple for the remainder of the flight, feared for her safety and felt she had been arrested. The Defendant treated the Plaintiff as the perpetrator (instead of the victim); joined, participated and exacerbated the racially hostile environment by acting in a discriminatory manner towards the Plaintiff while all along never reprimanding or asking the white racist couple to move, leave their chair, or the airplane.

The facts to be laid out in this Memo will clearly articulate how Southwest violated their own policies and procedures, participated in a racially hostile environment and acted in a discriminatory manner against the Plaintiff. It is completely unacceptable that in this day and age a major corporation such as Southwest who prides itself on customer service and protecting its passengers not only failed to fulfill their end of the bargain but jeopardized Ms. Parker's safety and racially discriminated against her.

To provide a better understanding of the facts involved in the racially hostile environment and discriminatory actions by Defendant against the Plaintiff, we have compartmentalized the events and circumstances of Flight 551 into four (4) time periods: (1) Plaintiff Boarding, (2) Racially Hostile Environment, (3) Discriminatory Actions and (4) Effects of Racial Discrimination. Each time period covers what occurred from the Plaintiff's standpoint along with the various witnesses' testimony, and how they relate to our underlying 42 U.S.C §1981 claim.

## II: STATEMENT OF FACTS

Plaintiff, Laurena Jacqueline Parker, is a retired, 71-year-old, African-American female, who resides in Inverness, Florida. She graduated from North Carolina Central University with her degree in Criminal Justice. Plaintiff purchased a ticket and entered into contract with Southwest Airlines for air transportation from Las Vegas, Nevada to Tampa, Florida on December 11th, 2017. At the time of the purchase of the airline ticket and continuing thereafter, Plaintiff had the expectation to equally receive all of the various rights, benefits and services offered by the Defendant when entering into contract for air transportation.

The Plaintiff's rights, benefits and entitlement to services are best memorialized in the various rules, policies, procedures, laws and regulations that govern the Defendant and the contractual relationship with the Defendant as follows:

- ***Exhibit A: Customer Service Commitment -* Ex. A. Page 2, SW00025**

  o Our Mission Statement: The mission of Southwest Airlines is dedication to the highest quality of **Customer Service** delivered with a sense of warmth, friendliness, individual pride, and Company spirit.

  o "Foremost, we want you to know that it is never our wish to inconvenience our valued Customers. We tell our Employees **we are in the Customer Service business**-we just happen to provide airline transportation."

- ***Exhibit B: Contract of Carriage – Passenger -* Ex. B. Page 16, §6(a)(8)(i) SW00063**

  o Comfort and Safety. Carrier may refuse to transport, or remove from the aircraft at any point, any passenger in any of the circumstances listed below as may be necessary for the comfort or safety of such Passenger or other Passengers and crew members:

    ▪ Persons whose conduct is or has been known to be disorderly, abusive, offensive, threatening, intimidating, violent, or whose clothing is lewd, obscene or patently offensive.

> ▪ Persons who have an offensive odor unless caused by a disability.

- o Carrier will transport Qualified Individuals with a Disability in accordance with the requirements of the U.S. Department of Transportation regulations, 14 CFR Part 382, unless the Carriage of such individuals *may impair the safety of the flight or violate* Federal Aviation Regulations. Ex. B. Page 18, §6(C)(1) SW00065

- **●** *Exhibit C: Flight Operations Manuel-* Ex. C. Page. 21-50, SW00089

  - o The following types of persons are considered unacceptable Passengers and will not knowingly be accepted for passage on Southwest Airlines unless they meet the definition of an individual with a disability criteria:

    - ▪ Any person in a mental or physical condition who requires physical restraint by an escort or by some other device and/or who become violent and cause injury, harm, or *discomfort to other Passengers or Employees*.

    - ▪ Is or has been known to be disorderly, abusive, offensive, threatening, intimidating, or violent. Refer to the Operations Binder for additional information.

    - ▪ Has an offensive odor, except where such a condition is the result of a Customer with a disability.

- **●** *Exhibit D: Ground Operations Manual-* Ex. D. Page 1-2, §1.1.4, SW00094

  - o **Race, Creed, National Origin, or Color:** Southwest Airlines provides equal services to all Customers regardless of race, creed, national origin, or color. <u>If a Customer objects to riding with another Customer because of race, creed, national origin, or color, that person should be advised of the Company's policy, and that all airlines are required by law to carry all persons who comply with Federal Regulations.</u>

- **●** *Exhibit E: Flight Attendant Manual-* Ex. E. Page 6-1, §6.0.0 1-5, SW00097

  - o Positively Outrageous Service: However, each Flight Attendant should use experience and skills acquired through training, as well as good judgment and common sense, when handling any Customer-service challenge that may arise. Ex. E. Page 1-1, §1.0.0 SW00095

  - o **Race, Creed, or Color: Southwest** Airlines provides equal services to all Customers regardless of race, creed, national origin, or color. <u>If a Customer objects to riding with another Customer because of race, creed, national origin, or color, that person should be advised of the Company's policy, and that all airlines are required by law to carry all persons who comply with Federal Regulations.</u> The Customer may be given the option of an immediate refund or making reservations on a later flight. Ex. E. Page 1-1, §1.2.1 SW00095

  - o Customer Misconduct

    - ▪ From time to time Flight Attendants may encounter a Customer whose behavior is unacceptable and/or offensive. Your training prepares you to redirect behavior using words and empathy: Ask the Customer to comply, Set the context, Present options, and Confirm.

- ***Exhibit F: Federal Aviation Regulation-* Ex. F. FAR 91.1105(a)(2)**

  o Passenger handling, including procedures to be followed in handling deranged persons or other persons whose conduct might jeopardize safety.

- ***Exhibit G: Guidance of Airline Personnel on Non-Discrimination in Air Travel – Resolve & Remedy (US DOT Office of General Counsel of Aviation Enforcement and Proceeding)***

  o This guidance provides practical and useful decision-making techniques for airline employees and contractors to use when distinguishing between situations where a legitimate safety or concern exists and situations in which concerns **are based on assumptions and stereotypes related to a passenger's race, color, national origin, religion, sex or ancestry.**

  o It is recommended that airlines "include conflict resolution techniques in their procedures and protocols, e.g., active listening, self-awareness, validating frustrations, anti-bias and anti-discrimination techniques, and honest communication.

To better understand the various individuals/witnesses involved to the racial discriminatory environment and actions are the following:

- Flight Attendant "A": Carmen Vargas (Ex. Q. D. ROG Response No. 2)
- Pilot: Gabriel Perea (Id. Response No. 2)
- Customer Services Agent: Chris Dolling (Id. Response No. 2)
- Customer Service Supervisor: Jason Walker (Id. Response No. 2)
- Non Party Witness & Passenger: Anne Brown (Id. Response No. 3)
- Non Party Witness & Passengers: Mr. Ralph Williams (Husband) and Mrs. Karen Williams (Wife) (Id. Response No. 3)

## TIME PERIOD #1: BACKGROUND & BOARDING

***Laurena Parker's Testimony.*** On December 11th, 2017, Plaintiff was ending a seven (7) day vacation while at her condominium timeshare in Las Vegas. Ex. H. Parker 61:14-25. She arrived at the airport at approximately 2:00 p.m., as it was a 4:45 p.m. flight. Id. 62:21-23. The Plaintiff was wearing a pair of slacks, top, and boots, and carrying a light jacket. Id. 63:13-23. She was not wearing any perfume as "it gives me a headache, makes me dizzy and sneeze." Id. 65:2-8.

After providing her boarding pass at the gate, she proceeded to walk down the jet bridge towards the airplane with the jacket in her hand. Id 73:2-9. When she entered the airplane, she immediately saw Flight Attendant Carmen Vargas ("Vargas") and asked her if the front row seat was vacant. Id. 74:3-10. Vargas said the front row seat was vacant. Id.13-16. Plaintiff also asked Vargas if the overhead was available and Vargas said she didn't know.

Plaintiff walked down the aisle, found an open cabin and placed her belongings (including her jacket) in the overhead bin. Id. 79:12-19. She proceeded to move towards the front to sit in the front row window seat, when she saw a Caucasian female ("Karen Williams") sitting in the middle seat and a Caucasian male ("Ralph Williams") sitting in the aisle seat. Id. 83:1-5. Plaintiff passed in front of the Williams to access her window seat and in fact did sit in the seat. Id. 84:16-23.

**Carman Vargas Testimony.** Carman Vargas ("Vargas"), the Flight Attendant "A' on Flight 551 was familiar and trained on Exhibit E and F. She does not recall Exhibit A, B or G. Exhibit I: Pages 14-21. As the "A', she was considered the "lead'. Id. 25:24. Vargas was in the front of the aircraft when the Plaintiff boarded the airplane. Id. 60:24.

**Anne Brown Testimony.** Ms. Anne Brown ("Brown") is an elderly female Caucasian passenger who rode in the front row (right side of the airplane) on Flight 551. She pre-boarded because of her service dog and recalls the Williams already sitting in the front row when she came in to the airplane. Ex. O. 7:11-24; 22:19-20. Sitting beside Brown was a Caucasian female passenger ("CFP") in her mid 50's (but doesn't recall her name). Id. 22: 5-2.

## TIME PERIOD #2: RACIALLY HOSTILE ENVIRONMENT

**Laurena Parker's Testimony.** "Soon as I fastened my seat belt and I sat back and I took a deep breath, and that's when the lady grabbed her nose and started screaming, "I'm allergic to you, B-I-T-C-H. You need to get up and move." I was blown away." Ex. H. 86:11-15. Carmen Vargas "was standing right there listening". Id. 87:7. "I took a deep breath, and I said, "Excuse me?" and she said, "You heard me, B-I-T-H (sic)." Id. 87:16, 18. " I was so shocked. The wind was knocked out of me. It was like I couldn't believe I was hearing that. And that's when her Caucasian friend said, "You heard what she said, bitch. Get the fuck up." Id. 87:20-23. "and that's when I responded back. "I don't see any reason why I should have to move. I was told by Carmen that this seat was free, and I have the right to sit here." And that's when Carmen said, "I did not tell you could sit there." Oh, my God. That's what blew my mind." Id. 88:2-8.

The Plaintiff further stated that the race discrimination with Carmen "…all started with her and the other couple, but she ignited it to go further.". ( Id. 151:9-1) because of her comment "I did

not tell you you could sit there." Id. 151:3-4. That is when Plaintiff felt helpless and afraid.

> **Q. And you believe Carmen was there listening to all of this?**
> A. Yes, because she responded back and said she did not give me permission to sit there, and that's when I felt completely helpless. Id. 88:13-17.

> **Q. Did Carmen say anything else at that time other than she didn't give you permission to sit there?**
> A: That's when she left and went into the cockpit. Id. 88:18-20.

> **Q. Okay. Did you respond to Carmen at all at that point?**
> A; No. I was shocked. Id. 88:18-20.

> **Q. So without any response from you, Carmen – you recall that Carmen went to the cockpit?**
> A: Yes. Id. 88:24-25; 89:1.

> **Q. Did the couple next to you say anything at that time?**
> **A:** Yes. Id. 89:2-4.

> **Q. What did they say?**
> A: 'When are you going to move" Why haven't you moved yet? Did you hear what we said? Id. 89:5-7

> **Q. At that point before you left the aircraft, did the couple next to you say anything else?**
> A: They kept badgering me. Id. 95:3-5.

> **Q. Can you remember anything specific they said or were they just say anything else?**
> A: They was just abusive, tormenting, giving me fear because the man was hollering and screaming at me. Id. 95:6-9.

> **Q. He kept saying that word?**
> A: Yes. "You need to move" Id. 95:14-15.

> **Q. So what happened next?**
> A: No one come to my rescue. No one said anything. Carmen didn't try to calm anything down. The next I know they fingered. Id. 95:16-19.

*Carman Vargas Testimony.* Plaintiff asked if the seat was available and Vargas acknowledge that it was. Id. 61:5-12. Vargas was in close proximity to the Plaintiff and the Williams in the front of the airplane. Id. 61:19-22. Because of the close proximity Vargas heard what was happening. Id. 103:6-11. Vargas states that Mrs. Williams tells her that she has allergies. Id. 61:25.

Vargas, Williams and the Plaintiff were in a small space and all close to each other. Id.94:2-12. Vargas did not smell any odor on the Plaintiff nor any odor in that area. Id.93:17-24; 94:9-12. There was no smoke odor on the airplane. Id. 99:13-18. Mrs. Williams was covering her nose and saying there's something affecting her, and her husband said she suffered from allergies. Id. 96:7-16. Tensions are high as Vargas states things are escalating, getting loud and there's a verbal altercation. Id. 96:14-16. On one end Vargas denies that the William's object to Ms. Parker riding beside them but on the other, she states that the objection is based on a perceived smell (and smell/odor that never existed). Id. 141:7-17.

*Jason Walker Testimony.* A document not produced in Defendant's initial response to our Request for Production but known as the ARD was provided to Plaintiff Counsel towards the end of the Walker's deposition. Ex. R. It is Walker's notes immediately after Flight 551 departed. Walker read the entire note into the record and the pertinent parts read that "Laurena was asked to move seats due to a dispute between her and a couple while on board" and the dispute with the other passengers "caused Laurena to feel humiliated and she felt discriminated.". Id. 39:6-18.

Walker retracts from his earlier testimony that he had no knowledge the dispute had to do with race discrimination, and finally admits that <u>he was aware and was on notice that the dispute was not just over smell but racial discrimination</u>. Id. 40:7-13.

*Chris Dolling Testimony.* Plaintiff had told Chris Dolling about the Williams complaining of an odor yet did not smell anything on her. Ex. K. 20:1-3; 26:2-4.

*Gabriel Perea Testimony.* Vargas goes to the cockpit and tells Gabriel Perea ("Perea"), the pilot, that there was an issue with passengers. Ex. L. 9:18-21. Perea also does not smell anything on the Plaintiff. Id. 25:2-3.

*Ralph Williams Testimony.* Mr. Ralph Williams says that when the Plaintiff walks past his wife she sets off her allergies. Ex. M. 13:14-16. In all the years of traveling on the plan beside his wife, Mrs. Williams, she never had an allergic reaction that he could recall. Id. 31:2-10. He then "proceeded to tell the lady that there are 25 other seats on the plane. Please feel free to find another one. I am not going anywhere." Id. 13:24-25; 14:1. Southwest did not ask him to move seats. Id. 20:23-25. Despite Mr. Williams being

brought into the airplane in a wheelchair, he did not use one to exit the airplane upon arrival to Tampa. Id. 27:5-12. He states that despite his disability he could have moved to another seat in the airplane and if asked to move he would have probably complied. Id. 29:18-25; 30:1-8.

*Karen Williams Testimony.* Ms. Williams testified that she is allergic to basically everything but dust, she has to constantly wear masks, prescribed Epipen (which she doesn't carry because she can't afford it) and carries a lot of medication in her purse all the time. Ex. N. 13:5-25. In fact her condition is not significant and is malingering. Id. 60-61; 78:16-25. She didn't have a mask on when she got into the plane and had no allergic reactions when about 95% of the passengers boarded in front of her. Id. 59:1-2; 61:7-10; 53:5-10. She can afford Epipen in light of her traveling lifestyle but chooses not to buy it. Id. 55-58. At the deposition, she didn't have any medications in her pursue which she says she carries at all times.

More egregiously, after having testified several times that she did smell an odor on the Plaintiff (and even wrote to Southwest and confirmed it, See Exhibit U), she finally corrected her testimony and said that in fact she never smelled an odor on the Plaintiff when she walked in front of her and sat down. Id. 72-74. She simply put her hand over her nose and mouth as a precaution. Id. 22:4-7; 61:21-25. She also said the Plaintiff smelled like cigarettes and saw cigarettes in her pursue when she sat down despite the Plaintiff being a non smoker and did not have cigarettes on her. Id. 82:12-25.

*Anne Brown Testimony.* Brown's initial recollection of the dispute starts with the William's complaining to Vargas "that they wanted Mrs. Parker to have another seat because his wife – and they were both talking at once – his wife was allergic to heavy perfume. You could say perfume, but they said "heavy" And they wanted her moved." Ex. O. 35:9-15; 39:6-9; 40:17-19. Clearly the Williams did not want the Plaintiff to sit with them, "period". Id. 43:1-8. The tone of the William's was such that both Brown and CFP heard it, said it was discrimination "and to the women next to me and myself, it was embarrassing." Id. 35:21-25. The Williams were very loud. Id. 36:6-18. Brown also did not smell any perfume on the Plaintiff, the treatment towards the Plaintiff "was awful" and "I mean, it was true discrimination". Id. 36:1-15. In Brown's mind, the William's was clearly discriminating against the Plaintiff and "I'm, like, boiling inside. Id. 37:1-3; 46:5.

# TIME PERIOD #3: DISCRIMINATORY ACTIONS

***Laurena Parker's Testimony.*** Once Carmen Vargas went into the cockpit, the pilot (Gabriel Perea) came out and "I was in a state of shock. I couldn't believe all of this was happening. I was just devastated. So when he came out of the cockpit, he started to lecture and looked directly at me, and he never took his eyes off me. He never looked at the people who were the wrongdoers. He just kept looking at me." Ex. H. 91:9-15. "He was chatting about the rules and regulations. I remember a little bit of that, and saying that we have to do this and we have do that. But he was just looking directly at me. He never – you know, if you're talking to a group of people you would dash your eyes to each person. So I don't know what Carmen went and said to him, but he just looked at me as if I was the one causing the confusion." Id. 91:17-25. "Like I stated, he was staring at me, making me feel it was my fault." Id. 93:2-3.

Customer Service Supervisor, Jason Walker, "came and pointed his finger for me to get out of my seat". Id. 95:21-23. Mr. Walker said "Get out of your seat. You need to come with me." Id. 96:2-3. The Plaintiff was given a direct and resolute order by Mr. Walker and she was deplaned. Once she is off the plane, she is surrounded by Carmen Vargas, Gabriel Perea, Jason Walker and Chris Dolling at the jet bridge. Id. 98:6, 14-15.

While on the jet bridge, Plaintiff recalls Carmen Vargas saying "Well, I have nothing to do with those people. I don't control them. I can't do anything to stop them from doing what they're doing." Id. 104:13-16.

> **Q. Well, can a flight attendant make a passenger apologize?** A: No, but they can seem like to simmer the situation down. I shouldn't have been out there. They should have moved those people if they were allergic to me. They should have tried to diffuse the situation by asking them to move as well. I feel like I was the one that they asked to move. I don't know what they did but I felt that way. So in the meantime, no one assisted me. I felt marked. I felt like I was responsible. I felt humiliated. I felt devastated. I felt just completely lost. I had no support. Id. 104:17-25; 105:1-4.

An unidentified passenger volunteered her front row aisle seat directly across from the William's to the Plaintiff contrary to Defendant's assertion that they found the seat for her. Id. 105:11-17.; 107:1-4.

**Q. When you were offered that seat, did you ask for a different seat?**
A. No. I had to follow instructions because I didn't want no problems. I did what they told me to do. Id. 105:18-21

**Q. But rather than ask for a new seat at that time, you just sat next to these people that had been harassing you?**
A. I had no choice because they had me out there on the tarmac or wherever it was. I had no control of where I sat or anything. After they called me off the aircraft, I had no choice of anything. Id. 109:10-16.

**Q. Okay. Whether or not you felt you had a choice, did you ever ask anybody from Southwest after you got back on the aircraft whether you could change seats?**
A: No. I didn't feel like that was my responsibility. They had taken me off. I didn't do anything but just wait there until they freed me to board the aircraft. Id. 109:17-23.

The Plaintiff further stated that ",,,when they fingered me to come off , I felt powerless, so I had to follow his instructions. I couldn't sit there and say I'm not moving, I'm going to stay in this seat because I paid for this seat, I have a right to sit here. I felt like they had authority over me. I felt like I was actually being arrested. " Id. 144:13-24.

**Q. During the flight, did you have any other problems after you took off?**
A. Yeah I had problems. Id. 110:1

**Q. What problems did you have?**
A. I was still sitting beside this man. Id. 110:2-3.

Plaintiff also stated that "I didn't see where they were taking my safety as a precaution. I didn't see where they were actually concerned about me. I was just treated as a nobody." Id. 123:19-21, "I couldn't believe that here I was still going to be sitting in harm's way, still going to be sitting right beside the people who had just mentally abused me, who had embarrassed me, who had attacked me verbally. I was just devastated, which took all joy and everything that I expected from this aircraft to have me to encounter, I received none of that." Id. 139:14-20 and "…. I feel like they should have given me some type of safety to make sure that these people did not attack me once I got off the aircraft. They didn't do that. Because I was still in fear because of the way that man was speaking to me. So I felt my safety was still at risk."Id. 140:15-20.

***Carman Vargas Testimony.*** Vargas tells the Supervisor what is going on and walks into the cockpit to tell the pilot. Ex. I. Id. 62:15-17; Id. 104:14-18. Parker is asked to leave the plane by Jason Walker. Id. 108:2-4. The William's are not asked to leave the plane and that she could not move them because of their disability.  Id. 110:7; 116:18-25. Vargas does not ask the Williams to move to another seat. Id.111:2-3; Id. 113:4-7. She also knows that Mrs. Williams did not board the plane in a wheelchair. Id. 116:10-12.

***Jason Walker Testimony.*** Mr. Jason Walker ("Walker") was the Customer Service Supervisor called by Chris Dolling when he was unable to deescalate the situation. Ex. J.  Page 7-8. He asked Ms. Parker to leave the airplane. Id. 10:10-17; 24:1-6.  Walker initially says he had no reason to believe that the dispute was related to race and neither did any of the Southwest employees. Id. 9:14-17; 22:4-9. He had never confronted an issue like this before and thought the William's did not present any safety issues despite never speaking to them. Id. 12:16-18; 13:20-22. Walker told Parker to sit in another seat. Id. 14:1-18.

Walker states that the only place you cannot put someone with a disability is in the emergency exit row but it is possible to put them in any other part of the airplane. Id. 30:3-7. He also states that it was possible to bring a wheelchair back in the airplane and have Mr. Williams taken out of the airplane like the Plaintiff. Id. 31:13-24. There's also no rule against bringing out 2 passengers with a conflict out of the airplane. Id. 35:11-15.

Despite the notice of discrimination by Parker to Walker, Walker still believes he used good judgment to place a black female passenger directly across the white racist male and female. Id. 45:2-11. The real reason why Walker never wanted to speak to the William's is because "I didn't want to accuse them of racism because I felt that could initiate another argument, if that – if that wasn't the case." Id. 49:25; 50:1-3. Clearly Walker intentionally ignored the "elephant in the room".

***Chris Dolling Testimony.*** Dolling had the authority to ask the William's to move seats, despite the alleged disability, but never did. Ex. K. 35:13-19; 57:1-3. Yet, he does recall Mr. William's making the request for Plaintiff to move her seat. Id. 41:20-25; 42:1-11; 44:4-9. Lastly, Dolling, just like Walker, agrees that no rule or regulations stops them from having brought in a wheelchair to take Mr. Williams out of the plane, like they did with Plaintiff, to equally investigate the matter. Id. 63:1-10.

***Ralph Williams Testimony.*** Southwest never asked him or his wife Mrs. Williams to step out into the jet bridge, "they asked us nothing." Ex. H. 37:9-18.

Mr. William's testified to having been arrested in 2005 and put in jail for domestic violence against his than African American wife. He was sent to anger management and substance abuse classes. Id.47:1-25; 48:2-7.

***Anne Brown Testimony.*** Later, CFP volunteered on her own to move to another seat and was never requested by anyone at Southwest to volunteer her seat. Ex. O. Id. 23:7-8; 73:7-18. Brown stated that CFP told her "..that's discrimination. Id.75:20-25.. When asked whether Southwest Airlines could have handled things better, she says "A hundred percent, yes." Id.38:6-8. Brown says there was a "red flag" that Vargas failed to act upon when the William's falsely report that there's a heavy perfume coming from Parker, when in fact Brown smelled nothing. Id. 41:19-22. Furthermore, Brown states that wouldn't you have the common sense to know that the William's excuse of perfume was false or pretexual since in fact Plaintiff never did smell. Id 75:1-25. In addition to that, the Williams "..were the ones pushing to have her removed." Id. 78:1-5.

When asked whether Brown thought Southwest discriminated against the Plaintiff, she states: "Well, let me ask you this question: Southwest is responsible for the people on board; right? And this couple acted out. So I do feel that they bear some responsibility. The wrong person was – they should have asked those other people to get another ticket then I don't know how to explain it, but they do bear some responsibility -." Id. 64:6-12.

Brown never heard a Southwest airline employee ask the William's to move to another seat or to leave the plane and they should have removed the "complainers". Id. 72:7-16.; 79:7-8.

### TIME PERIOD #4: EFFECTS OF RACIAL DISCRIMINATION ON THE PLAINTIFF

**Laurena Parker's Testimony**

> **Q. Do you believe that Southwest intended to discriminate against you because of your race?**
> A. Yes. Ex. H. Id. 130:11-13
>
> **Q. Why is that? What makes you say that?**
> A. Because I felt like if it was a Caucasian person, they would not have done that. Ex. H. Id. 130:14-16

**Q. And what makes you say that?**
A. Because I know discrimination from past discrimination. I know it when I hear it; I know it when I see it; and I know it when I feel it. And I encountered all three. I felt it; I heard it; and I saw it. Ex. H. Id. 130:17-22

The effects of the Defendant's racially discriminatory actions on the Plaintiff are clearly articulated throughout her deposition testimony:

"…I bear this scar for the rest of my life." Id. 131:15-16; "I feel traumatized." Id. 131:16; 93:12; 94:19 "I feel victimized." Id. 131:17; "I feel internally hurt." Id. 131:17; "It has affected me to the extent that I'm paranoid now." Id. 147: 10-11; "I was just so devastated" Id. 93:6; 105:3; "I was just in shock" Id. 94:17 "I felt humiliated" Id. 105:2-3; "I had been harassed" Id. 111:11; "I had been talked to ugly" Id. 111:11-12.

*Jason Walker Testimony.* He recalls Parker upset and crying while she is on the jet bridge. Ex. J. 25:2-4

*Gabriel Perea Testimony.* He recalls she was crying, weeping and felt embarrassed. Ex. L. 11:15-20.

*Karen Williams Testimony.* Referring to the Plaintiff, she said "….she was crying and upset." Ex. N. 39:2.

*Carmen Vargas Testimony.* Vargas admits Plaintiff was upset and crying over the situation. (Vargas depo 100: 5-8)

*Anne Brown Testimony.* Brown recalls that Ms. Parker's reaction to being asked to leave the plane was "negative" and "…hurtful to her...." as if "..she's the bad guy in this." Ex.O. 54:23-25; 55:20-21. Brown felt embarrassed about what happened to the Plaintiff and how she was treated. Id. 58:1-9. Brown unequivocally confirms the Plaintiff did not enjoy the rest of the flight. Id. 77:13-17.

## III: ANALYSIS

### I. <u>APPLICABLE STANDARD OF REVIEW</u>

Summary judgment is not appropriate unless the moving party is able to demonstrate that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(c). "In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party." <u>Jeffrey v. Sarasota White Sox</u>, 64 f. 3d 590, 594 (11th Cir. 1995). A fact is considered "material" if it is "essential to the proper disposition of the claim."

Mathis v. City of St. Augustine Beach, No. 3:13-CV-1015-J-34JRK, 2015 WL 1470762, at *13 (M.D. Fla. Mar. 31, 2015). An issue of fact is considered "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Id.* If there is sufficient evidence on which a trier of fact could reasonably find for the non-moving party, the Court may not grant summary judgment. *Id.* Most importantly, summary judgment is inappropriate where intent is clearly disputed in discrimination cases. Sweat v. Miller Brewing Co., 708 F.2d 655 (11th Cir. 1983).

## DISCUSSION

### A. Plaintiff Has Articulated a Prima Facie Case of Race Discrimination and Has Offered Sufficient Evidence To Create A Genuine Issue of Material Fact

The purpose of 42 U.S.C. § 1981 is to protect against racial discrimination in **all** facets of the contractual relationship. See H. Rep. No. 102-40, pt. I, at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630; H. Rep. No. 102-40, pt. II, at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 730-31. The continuous vigorous application of 1981 is to remove the impediment of discrimination from a minority citizen's ability to participate in the marketplace. See Callwood v. Dave & Buster's Inc., 98 F. Supp. 2d 694, 703 (D. Md. 2000). The language of §1981 expressly prohibits racial discrimination in the "performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. 1981. "Congress intended the amended language in section 1981- in particular, the use of the phrase "benefits, privileges, terms and conditions"- to be an "illustrative rather than exhaustive" list of the protected facets of the contractual relationship. Sawyer v. Southwest Airlines Co., 243 F. Supp. 1257, 1266 (D. Kan. 2003). The illustrative language was "intended to bar all race discrimination in contractual relations." *Id.* The use, of this phrase in Title VII of the Civil Rights Act of 1964, "evinces a congressional intent to strike at the entire spectrum of disparate treatment." *Id.* To prove a 1981 claim, Plaintiff must show that the discrimination was intentional. See Desrameaux v. Delta Airlines Inc. No. 215CV347CBAVMS, 2018 WL 1224100, at *10 (E.D.N.Y. Mar. 8, 2018)(citing Patterson v. City of Oneida, 375 F. 3d 206, 226 (2d Cir. 2004). A finding of discriminatory intent is a finding of fact, as are

findings of discrimination and causation. *Id.* And "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." <u>See Washington v. Davis</u>, 426 U.S. 229, 242 (1976).

In order to establish a right to relief under 1981, a plaintiff must show: (1) that she belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in 1981. <u>Adams v. U.S. Airways Group, Inc.,</u> 978 F. Supp. 2d 485, 498 (E.D. Pa. 2013). While the prima facie elements "are flexible and not to be applied rigidly, Plaintiff must show that Defendant intentionally or purposefully discriminated against her. Sawyer, 243 F. Supp. at 1270. Plaintiffs may either present direct evidence of discrimination or indirect evidence through the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green,</u> 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973). *Anderson*, 621 F.3d at 267-68.

To demonstrate indirect evidence of discrimination, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. <u>Adams,</u> 978 F. Supp. at 498. The purpose of this stage is to eliminate the most common nondiscriminatory reasons for the defendant's behavior. <u>See Tex. Dep't of Cmty. Affairs v. Burdine,</u> 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). Once Plaintiff establishes a *prima facie* case, the burden of production rests upon Defendant to articulate some legitimate nondiscriminatory reason for the adverse treatment accorded to Plaintiff. <u>McDonnel,</u> 411 U.S. at 792 (1973). If Defendant satisfies its burden, Plaintiff must show that its "reason is false" and pretextual for the actual reason of intentional discrimination. *Id.*

In order for the Plaintiff to make out a *prima facie* case, Plaintiff must show the following: (1) they are a member of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience as those enjoyed by white passengers under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the

protected class were not deprived of those services, and/or (b) **they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.**

1. **Plaintiff has established a prima facie case for racial discrimination in violation of 1981.**

   a. **Plaintiffs are members of a protected class.**

It is undisputed that Plaintiff is an African American woman and therefore, a member of a protected class for purposes of her respective claim brought pursuant to 42 U.S.C. 1981. Ex. H.

   b. **Plaintiff made herself available to receive services and treatment ordinarily provided by Defendant to all members of the public in the manner in which they are ordinarily provided.**

It is undisputed that Plaintiff entered into a contract with Defendant when she purchased her plane ticket to travel on Defendant's airline. Exhibit B, H and Q. Accordingly, it is likewise undisputed that Plaintiff made herself available to receive services and treatment ordinarily provided by Defendant to all members of the public in the manner in which ordinarily provided. Plaintiff therefore satisfies the second element of a prima facie case.

   c. **Plaintiff did not enjoy the same privileges and benefits of the contract as those enjoyed by white passengers under factual circumstances that rationally support an inference of unlawful discrimination.**

Plaintiff satisfies this element in that she is able to show: (i) she did not enjoy the same privileges and benefits of her contract with Southwest Airlines as those enjoyed by white passengers, by receiving services in a markedly hostile manner; and (ii) Defendant's failure to provide the same privileges and benefits to Plaintiff occurred under factual circumstances that support an inference of unlawful racial discrimination.

   i. **Plaintiff did not enjoy the same privileges and benefits of her contract with Southwest Airlines as those enjoyed by white passengers, by receiving services in a markedly hostile manner.**

Plaintiff's argument that she did not enjoy the same terms and conditions as those enjoyed by white passengers after being accused of being a liar, forcefully ejected from her seat, removed from the plane, forced to sit in a seat in harm's way and not protecting her safety from hostile passengers is clear. Plaintiff,

an African American passenger, was subjected to racial epithets, abusive language, and embarrassment from passengers seated next to her. Southwest Airlines' flight attendant witnessed the altercation and afforded her no protection of safety, disregarded her emotions, accused her of lying and provided false information to Pilot and crew members representing her as the perpetrator in the altercation causing harm and chaos. In support of the above, Plaintiff's Expert Susie Phelps provides her opinion on why and how the Defendant's failed in their duty to protect the Plaintiff and managing the events correctly. Ex. S. Additionally, Southwest airline provides an "open seating" policy to where any passenger can choose where to sit. Plaintiff was denied her rights and benefits of being able to voluntarily choose her seat on this flight. All actions taken by Southwest were in direct violation of the Contract of Carriage and incorporated Customer Service Commitment. Plaintiff's position is consistent with the very purpose of what Congress intended the language of "benefits, privileges, terms and conditions" of a contractual relationship to be. As noted above, Southwest's Contract of Carriage specifically provides for, "dedication to the highest quality of customer service delivered with a sense of warmth, friendliness, individual pride, and Company spirit.", "Always try to do the right thing!", "Never our wish to inconvenience our valued customers.", "in the Customer Service business- we just happen to provide airline transportation.", "Carrier, may refuse to transport, or may remove from an aircraft, at any point, any passenger that may be necessary for the comfort or safety of other passengers, such as: persons whose conduct is or has been known to be disorderly, abusive, offensive, threatening, intimidating, or violent… or persons who have an offensive odor, unless caused by a disability." **See Exhibit A and B.** Southwest breached their contract by not abiding by their policies set forth and because of Southwest's breach, Plaintiff was not able to enjoy all the privileges and benefits of the contract as other passengers were able to enjoy.

Defendant argues that it escapes liability because Plaintiff was provided with transportation from Las Vegas to Tampa and received full benefits of her contract. (Doc. No. 46). However, Southwest explicitly states in their Contract for Carriage that it provides more than solely airline transportation. Further, as noted above, Southwest's Contract for Carriage is very thorough and detailed. Southwest is able to enforce that

same contract against its passengers in the event of a breach; therefore, Southwest should also be held liable for the breach of contract and damages it caused to Plaintiff. When Plaintiff purchased her ticket with Southwest, she did not bargain for her safety to be jeopardized, receive poor customer service, be treated unfairly and unequal compared to white passengers, or to be embarrassed, humiliated, and intimidated by Southwest employees.

Defendant further argues that by Southwest providing Plaintiff with a travel voucher of $100.00, unused by the Plaintiff, the voucher was a form of compensation for the inconvenience and damages caused to Plaintiff on that flight and because she received this voucher, she therefore enjoyed all benefits of her contract. In other words, Southwest is acknowledging and admitting that it caused Plaintiff to be "inconvenienced" by breaching their contract. Coincidently, there is no evidence on the record that Defendant offered the same to the Williams based on the facts; confirming our position that Southwest knew Parker was the victim, intentionally discriminated against her, and breach her contract. It is a simple concept that when one enters into a contract with another party and expects to receive the benefits bargained for in the contract, any deviation from the expected original contract is an interference and deprivation of your rights, privileges, and benefits contracted for. The plaintiff has satisfied this element of the 1981 action.

### ii. Defendant's failure to provide the same privileges and benefits to Plaintiff occurred under factual circumstances that support an inference of unlawful discrimination.

There are multiple sets of facts that create an inference that Defendant's failure to provide the same privileges and benefits to Plaintiff was the result of unlawful discrimination. When Vargas intentionally singled out, removed and deplaned the Plaintiff it created an inference of intentional discrimination. Additionally, the record establishes that the Defendants discriminated against the Plaintiff for Defendant's willful failure to provide adequate training.

When viewed in the light most favorable to Plaintiffs, the following circumstances surrounding Defendant's decision to take such actions to single out and remove Plaintiff from aircraft create an inference that Defendants intentionally discriminated against Plaintiff because of her race.

1. Carmen Vargas was at the front of the plane when Plaintiff entered for boarding.

2. It was Carmen Vargas' responsibility to greet all passengers as they boarded the plane, count the passengers onboard the plane, conduct a final walk-through before the plane takes off, and ensure that everyone is safely in their seats.

3. Plaintiff asked Vargas whether she could sit in the vacant seat located in 1C and Vargas responded in the affirmative.

4. Once Plaintiff sat in her seat and put her seatbelt on, Mrs. Williams abruptly began to yell "I'm allergic to you bitch!"

5. Vargas directly witnessed the conversation between the Plaintiff and Mrs. Williams. Vargas recalls the complaint being about an odor and the Plaintiff saying "I don't smell, I don't even have perfume on." (Ex. I. 96: 4-16)

6. Vargas admits that Plaintiff did not smell and there was no odor.

7. Vargas admits Plaintiff was upset and crying over the situation. (Ex. I. 100: 5-8)

8. Mr. Williams demands Plaintiff to move seats. (Ex H. 88:1-17)

9. Plaintiff responds to Mr. Williams by asking why she should move seats because she decided to sit there and received permission from Vargas. (*Id.)*

10. Vargas interjects into the altercation and reneges her previous statement and denies saying that she gave the Plaintiff permission to sit there. (*Id.*).

11. Vargas then proceeds to the cockpit and notifies the Pilots of the situation explaining that a passenger was not following directions. (Ex. P Philip Day IR.)

12. A man walks out of the cockpit who Plaintiff perceives as the Pilot and begins to lecture Plaintiff about rules and regulations. (Ex H. 90:2-91:25).

13. Plaintiff continues to be taunted and abused by the Williams and no one came to help or stop the abuse from occurring. (Ex H. 95:3-19)

14. Plaintiff was then forcefully removed from her seat and asked to deplane. (*Id* at 95:17-96:9)

15. After Plaintiff was removed from seat and deplaned, Defendant offered various things that patronized Plaintiff and tried to make her feel comfortable because of how clear it was that Plaintiff was upset and alienated as a result of Vargas' actions and conduct of the situation.

16. When Plaintiff was forced to re-seat in close proximity to the Williams she feared for safety.

These facts establish that Vargas' decisions and actions on how to handle the altercation between the passengers was racially motivated. Vargas was in close proximity to the passengers and overheard the racially charged abusive conversation. Vargas came in contact with and had interactions with the Plaintiff on

multiple occasions such as, greeting the Plaintiff as she entered the plane to board, responding to Plaintiff's question whether the seat was vacant, and responding to Plaintiff's question whether the overhead was available for her luggage. At all times, Vargas never smells any odors emitting from the Plaintiff. All facts create a strong inference that Vargas understood and witnessed the racially charged environment, decided to take the side of and favor the white passengers, joining and perpetuating the incident, and labeled the Plaintiff as the perpetrator to have her removed. The Williams received a higher benefit and were treated better during this racially hostile environment because their desire to have the Plaintiff removed was successful, they were never reprimanded for their actions, they were not removed from the plane after becoming hostile and aggressive towards the Plaintiff, and they were never inconvenienced in any way. In fact, they ultimately received exactly what they wanted, which was to not sit next to an African American and attempted to hide their racism behind falsely accusing the Plaintiff of having an odor. Furthermore, this false accusation of odor from an African American is a common, historical, stereotype that many white people use in a derogatory manner towards African Americans. The record clearly establishes that Plaintiff never had an odor and she was removed from the plane for no valid reason, while the Williams, the instigators of the altercation were not removed. Furthermore, Plaintiff's Expert Gilbert Carrasco through his expert report and deposition provides the framework in which discrimination arises and how the facts in this case fall within that framework. Ex. T.

Additionally, Jason Walker admits to being aware that Plaintiff was being discriminated against. Ex. J. 39:6-18 and Ex. R. Plaintiff was extremely upset and tried to confide in Walker, however, Walker decided to ignore the discrimination and moved her to a seat she did not want (and placed her in harm's way). Walker should have addressed the situation in a proper manner by following the policy and procedures and removing the Williams from the flight.

In its Motion for Summary Judgment, Defendant does not bother to even discuss the factual circumstances surrounding the false odor and dispute that arose causing Vargas to make intentional discriminatory decisions and actions. Rather, Defendant simply states that because the three passengers were

not "similarly situated" then there can be no argument as to whether Mr. and Mrs. Williams received better treatment or full benefits of the contract in comparison to the Plaintiff. Defendant's use of the definition similarly situated is misplaced. Using Defendant's choice of case, in <u>Shumway v. United Parcel Service</u>, 118 F.3d 344, 352 (6th Cir. 1998), the court explains that Plaintiff must show he is similarly situated in all relevant material aspects to the circumstances. In this case, the plaintiff was a female alleging discrimination in the workplace by her supervisor. The other person was a male, who did not have the same supervisor and did not engage in the same conduct as the female plaintiff. The court held because of those reasons they were not similarly situated.

In our present case, there are three passengers to compare to meet the definition of similarly situated-Plaintiff Laurena Parker, Mr. Ralph Williams, and Mrs. Karen Williams. All three are alike for the following reasons:

1. Each are passengers and customers of Southwest Airlines.
2. Each purchased a ticket for open seating and boarded the plane from Las Vegas to Tampa.
3. Each expected to receive the full benefits of their contract including good quality customer service and safety.
4. Each were "supervised" by Carmen Vargas who was their assigned flight attendant for their section.
5. Each was involved in the altercation.

Defendant attempts to raise the reasons why all passengers were not similarly situated was because Plaintiff was a single person and the Williams were a couple. This reason fails. Each person is an individual, who purchased a single ticket for a single seat on the plane. We cannot hold Mr. Williams and Mrs. Williams as a unit just because they are married. When one person, who happens to be married, commits a harmful or criminal act, the law does not punish both persons for a crime that one person commits. In this case, the racially abusive altercation was between Mrs. Karen Williams and the Plaintiff. Mrs. Williams is the person who began to scream and make a scene that she is "allergic" to the Plaintiff. If anyone should have been reseated or more importantly, removed from the plane, it should have been Karen Williams. Unfortunately, the flight attendant that day, Carmen Vargas, who witnessed the racial environment, made the decision by using her subjective "good judgment" and "common sense" to

participate and contribute by taking the side of the Karen William for no apparent reason and have the Plaintiff removed from her seat.

Further, Defendant tries to raise that Plaintiff had a C37 boarding number and the Williams were pre-boarded. This reason bears no relevancy to the similarly situated definition. All three were still allowed to board the plane and Southwest has an open seating policy. Plaintiff asked to confirm with Vargas whether 1C was a vacant seat and she said it was. If the order of when passengers board a plane bears relevancy to defining similarly situated persons, there would never be a case where any person in this context would meet this standard.

Lastly, Defendant raises that Mr. Williams was a disabled passenger. As noted above, this argument bears no relevancy. Mr. Williams was allegedly disabled (he could walk with or without a cane) but there was no valid reason, other than inconvenience, (which the Plaintiff was inconvenienced), that Mr. Williams could not have been wheeled out of the plane. Mr. Williams in his deposition even agrees he could have moved. Id. 29:18-25; 30:1-8. Christopher Dolling, who is an Operations Agent and can also act as a CRO, could wheel Mr. Williams out of the plane. Southwest Flight Operations Manual specifically states that, an "unacceptable passenger" will not be accepted by Southwest if person may endanger another passenger's health, safety, or comfort because he is disorderly, abusive, offensive, threatening, intimidating, or violent. If such person is disabled, the Complaint Resolution Official (CRO) must be present to escort. All Operations Agents are qualified CROs. See Exhibit C. Further, if the court holds that Mr. Williams is not similarly situated because of his disability, this would still not change the fact that Mrs. Williams is similarly situated in all material relevant aspects.

The second relevant set of facts is Defendants recklessly failed to provide adequate training to its flight attendants and other employees on the serious issue of discrimination. Vargas admits that the Southwest provides in-house training and it is completed in three weeks, not being enough time. It is a very intense program, lasted six days a week, from 6:00 AM to 6:00 PM. Ex. I. 24:2-10. Vargas was very sleep deprived during the training because of the intensity. Id. 42: 9-14).

Vargas admits that the training did not touch much on how to resolve conflicts between passengers. The main topic that is the focus of training is safety. (Id. 13:9-14). Which ironically, Vargas does not even have the safety of passengers in her best interest, proven from this racially abusive environment. Vargas also does not recall much of her training. After being asked several questions about what type of training she received in the three weeks, she cannot remember anything. (Id. 17:1-12). There is no specific protocol to follow except her good judgment. (Id. 39:14-23).

Additionally, Defendant has a prohibition on discrimination policy in their flight attendant manual. As noted above, it specifically states that if a customer objects to riding with another customer based on their race, creed, or color the objector should be advised of the airlines policy and the customer may be given the option of an immediate refund or making a reservation on a later flight. Ex E. Instead of following this policy, Vargas treated the Plaintiff as the objector, instead of the Williams as the true objector in this matter. The Williams discriminated against the Plaintiff because she was African American and tried to conceal their racism behind an "odor" that no other persons involved can concede to. Vargas then discriminated against the Plaintiff by not following the prohibition discrimination policy, siding with the Williams and then having the Plaintiff removed from the plane. All of the above creates a strong inference that Defendant's discrimination was intentional and unlawful.

By establishing that (1) Plaintiff is members of a protected class, (2) Plaintiff made herself available to receive services ordinarily provided by Defendant to all members of the public in the manner in which they are ordinarily provided, and (3) Plaintiff did not enjoy the same privileges and benefits of their contract with Defendant as those enjoyed by white passengers under factual circumstances which rationally support an inference of unlawful discrimination, Plaintiff has successfully established a prima facie case for race discrimination in violation of §1981. The burden of production now shifts to Defendant to "produce evidence of one or more legitimate non-discriminatory reasons for the adverse treatment accorded to Plaintiff." See Callwood, 98 F. Supp. 2d at 708.

2. **Defendant is unable to articulate a legitimate, non-discriminatory reason for isolating and forcefully removing the Plaintiff from her seat.**

Defendant argues that Southwest employees acted in accordance with company policy, which is to provide good judgment. Good judgment is a subjective policy that would be determined based on the person who is in the situation and handling the incident. Vargas claims her "good judgment" was to pick on the Plaintiff who did not cause any issue and was being harassed and abused by the Williams. Anne Brown, being an unbiased third party, also witnessed the incident and when using her "good judgment" she interpreted the situation to be a very direct form of discrimination.

Defendant further argues that Plaintiff requested to be seated in the front row next to the Williams. As noted in the facts above, she did not request to be seated next to the Williams. Plaintiff did not think she had a choice in anything after she was removed and taken to the jet bridge. Plaintiff was surrounded by at least four employees during the conversation outside of the jet bridge where she felt scared, fearful and intimidated.

For all reasons discussed above, Defendant's argument must fail. Plaintiff has satisfied the prima facie case for race discrimination under § 1981. Therefore, Defendant's Motion for Summary Judgment must be denied.

If this Court determines that Southwest has met its burden articulating a legitimate, non-discriminatory reason for its action, Plaintiff must discredit Southwest's proffered explanation. <u>Combs v. Planation Pattern</u>, 106 F.3d 1519, 1528 (11th Cir. 1997). The Plaintiff has demonstrated sufficient evidence in the argument above for a reasonable fact finder to conclude that Southwest's explanation was not the real reason for its action.

**B. Punitive Damages are Appropriate in This Case.**

Punitive damages should be awarded to the Plaintiff if the jury determines that Defendants' discriminatory conduct was malicious, willful, and in gross disregard of Plaintiff's rights. <u>See Hampton v. Dillard Dep't Stores, Inc.</u>, 247 F.3d 1091, 1115 (10th Cir. 2001). Furthermore, on its face the statute supports

allowing punitive damages: "…and shall be subject to like <u>punishment</u>, pains, penalties, taxes, licenses, and exaction of very find, and to no other." 42 U.S.C. §1981(a). Plaintiff has presented sufficient evidence to justify giving the issue of punitive damages to the jury. *Id.* Defendant has exhibited a reckless indifference to the rights of Plaintiff. Defendant has been involved in multiple suits for discriminatory conduct and it is time for Defendant to be punished for their actions. For these reasons above, summary judgment is not appropriate on the issue of punitive damages regarding Defendant's malicious and willful conduct and utter disregard for Plaintiff's rights.

## IV: CONCLUSION

Based on the above disputed factual allegations regarding the events that occurred on December 11, 2017 and its application to the underlying claim, Plaintiff respectfully requests that this Court denies Defendant's Motion for Summary Judgment.

Respectfully submitted,

BLACK ROCK TRIAL LAWYERS

By:<u>/s/ Gil Sanchez</u>
Gil Sanchez, Esq.
Florida Bar No. 753981
201 S. Westland Ave. Tampa Fl 33606
Office:     813-254-1777     Fax:     813-254-3999
gil@blackrocklaw.com
sabrina@blackrocklaw.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the Defendant's Counsel via email and the CM/ECF System on August 13, 2019.

BLACK ROCK TRIAL LAWYERS

By:<u>/s/ Gil Sanchez</u>
Gil Sanchez, Esq.
Florida Bar No. 753981
201 S. Westland Ave. Tampa Fl 33606
Office:     813-254-1777     Fax:     813-254-3999
gil@blackrocklaw.com
sabrina@blackrocklaw.com
Attorney for Plaintiff