UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISISON

LAURENA PARKER,

    Plaintiff,

vs.                                         Case No. 8:18-CV-1197

SOUTHWEST AIRLINES CO.,

    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

With the benefit of full briefing and able argument by both sides at a hearing, the Court grants the Defendant's amended motion final summary judgment on all claims (Dkt. 52) pursuant to Fed. R. Civ. P. 56.

### A. INTRODUCTION

Plaintiff Laurena Parker filed this lawsuit against Southwest, asserting a claim against it for violation of 42 U.S.C. §1981. Plaintiff alleges that Southwest intentionally discriminated against her based on her race during a December 11, 2017, flight from Las Vegas to Tampa. In this case, the crew of Southwest Airlines encountered a dispute between Plaintiff and two other passengers during the boarding process, at the beginning of a long and full flight. There is

no direct evidence that Southwest engaged in racial discrimination in resolving the dispute, nor is there any material or sufficient indirect evidence that a Southwest employee or agent engaged in intentional racial discrimination against Plaintiff. Although Plaintiff encountered a rude pair of travelers and was unhappy with the manner in which Southwest resolved the dispute, she was delivered safely to her destination as she contracted.

### B.  LEGAL STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir.

2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

Section 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

The Court is guided by the Eleventh Circuit's teachings in *Kinnon v. Aycoub,*

*Gopman & Associates, Inc.*, 490 F.3d 886 (11th Cir. 2007). "To state a claim under § 1981, a plaintiff must identify an impaired contractual relationship . . . under which the plaintiff has rights." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 890 (11th Cir. 2007) (internal citation and quotation omitted). To withstand a summary judgment motion under section 1981, a Plaintiff must identify a genuine issue of material fact that: 1) Plaintiff is a member of a racial minority; 2) the Defendant intended to discriminate on the basis of race; and 3) the discrimination concerned one or more of the activities enumerated in the statute, which include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* at 890–91. Plaintiff fails both the second and third elements. The Eleventh Circuit's admonition in *Kinnon* is apt here: "Section 1981 does not provide a general cause of action for all racial harassment that occurs during the contracting process. Rather, 'in the retail context, the plaintiff must demonstrate the loss of an actual . . . contract interest.'" *Id.* at 892.

### C. UNDERLYING FACTS

Here, the facts (viewed most favorably to Plaintiff) show a crowded passenger-loading scramble typical of hurried aircraft boarding, in which a couple seated in Plaintiff's row were quite rude. Southwest resolved the issue effectively, without racial animus, albeit in a manner not satisfactory to Plaintiff. Plaintiff has not demonstrated

material or real racial animus intended by Southwest.

Plaintiff is an African American female, approximately 71 years old. Dkt. 59 at 2. She has suffered from anxiety/stress disorder for twenty years and has been treating it for the last ten years or so, somewhat intermittently. Dkt. 59-8 at 24–26. She boarded a nonstop flight on Southwest from Las Vegas to Tampa in December 2017, one of Southwest's longer trips. *Id.* at 123. She was a frequent traveler. *Id.* at 57–58. The 175-passenger plane was nearly full, and she boarded late as ticket C-37. *Id.* at 67–68; Dkt 59-9 at 29; Dkt. 59-15 at 22. She testified there were about 10 passengers behind her. Dkt. 59-8 at 69.

The white couple boarded first or very early, because the husband was disabled (on permanent social security disability) and loaded onto the plane on a wheelchair. Dkt. 59-13 at 8. This couple were large in size. Dtk. 59-15 at 21. The husband sported cowboy boots and hat, and had a cane. Dkt. 59-13 at 14–15. This couple sat in Row 1, seats B and C (port side, wife in middle and disabled husband in aisle seat). Dkt. 59-15 at 18–19. Also boarding early was a passenger in Row 1 seat E (starboard side).[1] This passenger had a "huge dog" that was her aid for anxiety attacks. Dkt. 59-8 at 118–19. Another passenger sat in Row 1 seat D (starboard aisle). Dkt. 59-15 at 14.

---

[1] It is unclear in the record whether there were two or three seats in the front starboard side. The Row 1E traveler could not remember but knows she was in the middle seat with her dog next to the window. Regardless of whether there was a chair next to the window or not, as a service dog gets a seat, it is immaterial for the purpose of this motion whether there was a chair there or not. *See* Dkt. 59-15 at 8–14; Dkt 59-8 at 115–16.

Plaintiff boarded late in the process. Dkt. 59-8 at 67–68. She stated she asked the forward flight attendant if she could sit in seat 1A (window) which was open. *Id.* at 74. The flight attendant said yes, it is open seating on Southwest. *Id.* at 74; 59-9 at 61. Upon crossing over the couple to Plaintiff's row 1 window seat, a dispute arose with couple. Dkt. 59-8 at 82–86. Plaintiff (whose version the Court credits for this ruling) testified that the female grabbed her nose and started screaming "I am allergic to you b-i-t-c-h. You need to get up and move." *Id.* at 86. Plaintiff testified that the husband joined in the cursing, loud verbal assault in the same manner.[2] Dkt. 59-8 at 87–88. As to the couple, Plaintiff testified, "they were just mentally abusing me with words that I don't remember. They was just going crazy." *Id.* at 88–89. Plaintiff noted that because of her shocked "state of mind" at the time, it is possible that she did not accurately hear or process what the couple or Southwest staff were saying to her. *Id.* at 142–43.

No third-party heard the precise words being exchanged between the seated couple and Plaintiff. Dkts. 59-15 at 32–33; 59-9 at 96. The traveler with the dog across the aisle said the couple wanted Plaintiff to move and were complaining that Plaintiff wore perfume and the wife was allergic. Dkt. 59-15 at 35. The flight attendant related the same history, basically. Dkt. 59-9 at 96. The attendant noted that the two ladies

---

[2] The husband was formerly married to an African-American woman with whom he had two children. Dkt. 59-13 at 18. In 2005, he had to complete anger management, substance abuse counseling, and felony probation due to a domestic violence incident with this former spouse. *Id.* at 46, 48–49.

were having an altercation, and were loud. *Id.* at 105. Although not credited here, the complaining wife testified that she was highly allergic to many things. Dkt. 59-14 at 22, 74. She testified that when Plaintiff crossed her in the front row to sit down, the female put her hand over her nose, and vaguely smelled cigarette smoke, and (again, vaguely) maybe mothballs or perfume.[3] *Id.* at 20–21, 81–84. The female testified she said nothing, but Plaintiff said "What are you saying, I smell?" *Id.* at 22–27, 82–84, and then the dispute arose and accelerated.

In the entire episode no person except the seated female detected any odor on Plaintiff.[4] This record contains no instance of a racial word being used or heard, by anyone at any time. *See* Dkt. 61. Plaintiff does not claim the offending couple used a racial term or mentioned race. Dkt. 59-8 at 86–89, 95, 98, 125, 128.

The flight attendant testified that "they were getting loud and they're going back and forth about it" and "they were really at each other. I was not even being listened to." Dkt. 59-9 at 62, 104. It was clear to the flight attendant that the passengers could not sit together on this long flight. *Id.* at 62. Plaintiff testified that the flight attendant was in a position to witness all the words exchanged with the couple. Dkt. 59-8 at 87–88. Plaintiff also testified that she reminded the flight

---

[3] There is some dispute in the female's testimony over whether she initially smelled anything or whether her actions were precautionary. Dkt. 59-14 at 71–74. However, for the purposes of this ruling, viewing all facts in the light most favorable to Plaintiff, the Plaintiff did not have any odor.

[4] Dkts. 59-13 at 17; 59-15 at 70–71; 59-9 at 93–94; 59-10 at 31; 59-11 at 25–26; 59-12 at 20.

7

attendant that the attendant said Plaintiff could sit in that seat, and attendant then denied saying that. *Id.* at 87–88. This flight attendant, Carmen Vargas, was of Hispanic heritage and in a long-term relationship with an African-American male partner. Dkt. 59-9 at 143. The flight attendant alerted the captain about the issue, which is standard protocol. *Id.* at 62. The captain, Gabriel Perea, was of Hispanic heritage. Dkt. 52-5 at 1. Plaintiff recalls he talked to her for about a minute, discussing "rules and the regulations." Dkt. 59-8 at 91–94. She felt he was addressing her alone, directly. *Id.* She remembers him saying "Y'all have to get along," *Id.*, but she was so shocked "I couldn't hear nothing he was saying. It was just like I was out of it." *Id.*

After the captain returned to the cockpit, Plaintiff testified the male resumed calling her a bitch. *Id.* at 95. Shortly thereafter, another Southwest employee, an African-American male, came on board and instructed Plaintiff to step forward about 15 feet to the front where the plane met the jet bridge. *Id.* at 95–96. On her way there, one of the pilots offered her something to drink in a friendly way. *Id.* at 99. She felt "insulted" by this because she thought he was offering her alcohol to calm her down and she does not drink, but in retrospect she testified, "maybe I took it the wrong way, but that's the way I felt." *Id.* at 98–99, 133.

When asked if she thought she would have been asked to get out of her seat "regardless of [her] race" she testified "Yes. Because he had to follow the rules and

regulations that was given to him by the company." *Id.* at 149–50 ("[T]hey were following rules that was given to them. I don't think color had anything to do with it. Could have been white or black [staff]. Either way I was asked to come up out of my seat"). The persons who asked to speak with her at the jet bridge door "were nice to me to a certain degree. They were following rules and regulations." *Id.* at 132.

While in the jet bridge doorway area with a pilot and the employee, the African-American employee told Plaintiff "we're sorry for your inconvenience" and "we're sorry to inconvenience you." *Id.* at 100–02. It was at this point Plaintiff began crying. *Id.* at 101. Plaintiff heard the crew say "This issue has to be solved." *Id.* at 103. Although Plaintiff does not allege that anyone on the crew said the delay was her fault, she felt as though she was being held responsible. *Id.* at 100–03. The employee stated Southwest would offer her some compensation for her discomfort. *Id.* at 106.

Plaintiff said that she wanted apologies from the flight attendant and from the couple. *Id.* at 103–04, 111–12. The flight attendant, who was in the discussion then, apologized but stated she could not force the couple to apologize. *Id.* at 112. Plaintiff testified in her deposition that she did not view this apology as genuine. *Id.* Plaintiff testified that she asked for another seat, and the staff informed her that a passenger had volunteered to move, so Plaintiff could still sit in the front row across the aisle from, not next to the couple. *Id.* at 105–09. Plaintiff asserts that she did not want to sit so close to the couple, but states that she did not ask for a different seat

at any time. *Id.* at 124. She sat there knowing there might be other seats elsewhere in the plane. *Id.* at 109. She had no further interaction with the offending couple whatsoever. *Id.* at 110, 115, 128.

The flight attendant made an announcement to the passengers to the effect that "we should all get along" which upset Plaintiff, who thought this should have been said earlier and been directed at the couple. *Id.* at 121–23. But Plaintiff testified that she thought the announcement was "protocol" and that the attendant was "doing her job to try to let everybody know that now it's time for us to take off and let them know the situation had been diffused." *Id.* at 121–23. Although not considered for the purposes of this motion, the male in the dispute thought this announcement was made while the attendant was looking directly at him and he considered it directed to him as a reprimand. Dkt. 59-13 at 21–22.

Plaintiff flew to Tampa as scheduled. Dkt. 59-8 at 123. She complained that Southwest failed to provide her with any special treatment on the remainder of the flight. *Id.* at 123. Upon landing she went to the customer service desk to collect the compensation promised for her inconvenience. *Id.* at 126–27. Later she contacted the airline by phone for compensation and was hoping to have her entire fare ($400) refunded. *Id.* at 34–38. The Southwest representative offered her $50, which Plaintiff declined and informed the representative that Plaintiff was displeased "'by your attitude' . . . [meaning] the way she talked to me. 'So I think I need to call a lawyer

about this.'" *Id.* at 31–32, 36–37, 43–44. The representative put Plaintiff on hold and then offered $100, which Plaintiff agreed to accept but then told the representative the voucher would not end the situation and she was going to contact her attorney. *Id.* at 36–43. She received the voucher a week later by mail. *Id.* at 39.

Plaintiff testified that she has flown Southwest Airlines "all of my life" and has never encountered a problem with that airline beyond the instant matter. *Id.* at 59. At her deposition Plaintiff stated, "I will definitely fly [Southwest] again." *Id.* at 58–59.

### D. PLAINTIFF HAS NOT ESTABLISHED A PRIMA FACIE CASE

Plaintiff's case does not establish the second and third elements of a § 1981 claim. Plaintiff failed to identify genuine issues of material fact that Southwest intended to discriminate against her on the basis of race and that the discrimination concerned the contractual relationship.

First, Plaintiff has not established, or pointed to a material disputed fact, that Southwest intentionally discriminated against her. Plaintiff's counsel points out that the offending couple, and not Plaintiff should have been asked to step off the plane for the discussion. Dkt. 59 at 21–22. Likewise, counsel argues that the couple should have been moved and not plaintiff. *Id.* This argument fails for several reasons. First, none of it is any indication of an *intentional* plan by the Hispanic pilot and attendant, and the African-American customer representative, to discriminate against Plaintiff due to her race—to suggest otherwise is conjecture.

11

The couple boarded first, and the male had a bona fide disability and he was loaded in a wheelchair. Dkt. 59-13 at 8. The record is uncontested that he was disabled with a spine and neck injury and needed to sit on an aisle. It was quite unlikely that after at least 167 of 175 seats were loaded[5] that two seats could be found together. Both the flight attendant and the customer service representative stated there were no two seats together remaining vacant. Dkt. 59-9 at 102; Dkt. 59-10 at 17–18. The African-American customer service representative stated: "The FA's and I looked for 2 open seats to move the couple to but because the flight was full, there were only single seats. . . . I remember marking [Plaintiff's] reservation . . . to issue a [compensation voucher] for her switching seats." Dkt. 52-4.

The flight crew was left with a decision of who to move. The disabled passenger with a cane who embarked via wheelchair was best seated with his wife, on an aisle, near an exit. Moving him at such a late stage in boarding was quite unlikely and most likely impossible. Relocating a single, able-bodied passenger who boarded late was much more practical, and indeed was accomplished easily. Plaintiff moved about 10 feet (from window 1A to aisle 1D) after Plaintiff asked to be moved.

Likewise, it was highly impractical at that late stage to locate a wheelchair back

---

[5] Plaintiff, at C37, was the 157th passenger aboard and she testified about ten followed her. Dkt. 59-8 at 67–69. Flight Attendant Vargas testified the aircraft held 175 passengers. Dkt 59-9 at 29. Plaintiff testified "The plane was fully loaded almost when I got on." Dkt. 59-8 at 84. The women with the dog said "it was a full flight." Dkt. 59-15 at 21–22.

in the terminal and have it wheeled down the jetway, into the plane, so the disabled passenger could be taken to the jetway door to talk, and then be wheeled to another seat. The flight attendant testified that because the male was wheeled into the first row on a chair, she was reluctant to move him for ADA (Americans with Disability Act) reasons. Dkt. 59-9 at 111, 115–16. She also expressed concerns about a disabled person needing to be on an aisle near an exit. *Id.* at 111. Further, the disabled man's wife testified that he has military-related Post Traumatic Stress Disorder that she alleviates for him during travel, Dkt. 59-14 at 9, thus suggesting they should not be separated.

The differential treatment between the offensive couple and Plaintiff was: 1) Plaintiff moved over three seats across the aisle, and the couple stayed in their seats; 2) Plaintiff was asked to step 15 feet forward to discuss the matter privately at the aircraft door; 3) Plaintiff was offered a complimentary drink; 4) Plaintiff asked for and received an apology from Southwest along with a $100 voucher. Dkt. 59-8 at 36–43, 95–96, 99, 111–12, 124. There is no contested issue of fact that indicates this minor disparate treatment was due to intentional racial discrimination by the airline or somehow constitutes pretext. In short, Plaintiff fails to establish a contested material issue of fact as to Southwest's intentional race discrimination.

A portion of Plaintiff's argument suggests liability because the flight attendant was not warm or sufficiently customer-friendly, as required in Southwest's customer

service guidelines. Dkt. 59 at 17. Plaintiff testified the attendant was rude because "she never even tried to console me or anything during the whole time. . . . [S]he was part of the problem by not supporting me in time of need." Dkt. 59-8 at 111. Plaintiff complains that during the flight she "wasn't given any type of special treatment," i*d.* at 123, and she felt that was due. But the statute proscribes racial interference in contract, not brusque service.[6]

The women with the large dog also said the flight attendant was cold or unfriendly to her during the flight. Dkt. 59-15 at 24–25, 56. Flight attendant Carmen Vargas, on a crowded long flight heavily-laden with passengers during the Christmas season, encountered a large couple in cowboy attire causing a ruckus in the front row with Plaintiff who had an anxiety disorder, delaying departure. Sprawled across the same row was a "huge dog" that Plaintiff noted was "restless" and "squirming." Dkt. 59-8 at 118. One might forgive Carmen for some curtness.

Even taking as true that Ms. Vargas denied telling Plaintiff that she could sit in her preferred seat once the dispute arose, this is not enough to establish discrimination. In *Benjamin v. American Airlines*, a Haitian family had one of their tickets denied because the family member did not take the first leg of a multi-stop flight. *Benjamin v. Am. Airlines, Inc.*, No. CV 213-150, 2015 WL 8968297, at *1 (S.D. Ga.

---

[6] *See Akins v. McDonald's Restaurants of Fla., Inc.*, No. 608CV1243ORL22GJK, 2010 WL 11623679, at *6–7 (M.D. Fla. Feb. 19, 2010) (discussing how poor service does not amount to a §1981 violation).

14

Dec. 15, 2015). The family was insulted when the gate attendant, in front of other passengers, stated, "that the Benjamins required the services of an interpreter because they 'don't speak English well.'" *Id.* at *2. The court held that even if the statement was rude "it falls far short of constituting any evidence of discrimination. A single insult, without more in the form of attendant circumstances or otherwise, does not provide the foundation for a claim under 42 U.S.C. § 1981." *Id.* at *7. Similarly here, Ms. Vargas single statement, even taken in the harshest light, does not amount to evidence of discrimination.

The second problem with Plaintiff's case is that her contract was fulfilled. "To state a claim under § 1981, a plaintiff must identify an impaired contractual relationship . . . under which the plaintiff has rights." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 890 (11th Cir. 2007) (internal citation and quotation omitted). Plaintiff alleges that her contract with Southwest was impaired because of Southwest's actions on this flight. Dkt. 59. However, she was delivered safely by Southwest to her destination on the flight she booked, notwithstanding an initial encounter with two rude travelers.[7] Although she now expresses a preference for a different seat other than first row starboard, across the aisle from the insulting

---

[7] This contrasts with cases where the plaintiff alleges that they were prevented from operating under the contract. *See Howell v. Greyhound Lines, Inc.*, No. 1:07-CV-1113-TCB, 2009 WL 10666051 (N.D. Ga. Apr. 3, 2009) (Plaintiff was kicked off the bus by the driver); *West v. LQ Mgmt., LLC*, 156 F. Supp. 3d 1361 (S.D. Fla. Oct. 30, 2015) (Plaintiffs were told to leave the hotel after they had already checked in and paid for their room).

couple, she did not express this preference at the time. Dkt. 59-8 at 124.

Beyond the failure to prove Southwest's racial intent, Plaintiff's prima facie case also fails because she has not established a real, actual thwarting of her contract rights. Her trip did start out unpleasantly, and while enroute she did not receive special attention that she thought due. But Southwest's conduct in addressing the situation did not thwart what Plaintiff had contracted for: a safe flight home as booked. She was not "actually denied the ability either to make, perform, enforce, modify, or terminate a contract" on account of racial discrimination by the defendant. *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 892 (11th Cir. 2007) (*citing Arguello v. Conoco, Inc.*, 330 F.3d 355, 359 (5th Cir. 2003)). *See also, Lorenzo v. Virginia Win and Target Corp.*, 2011 WL 13174851 (M.D. Fla. Mar. 18, 2011) (mocking and slow treatment by retail clerk was not actionable because commercial transaction was completed).

## CONCLUSION

The Clerk shall enter final judgment for defendant and close this file. So Ordered, this 11th day of September, 2019.

> /s/ William F. Jung
> **WILLIAM F. JUNG**
> **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record